UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
----------------------------X
                            :
FENG LIN,                   :
                            :    17-CV-3043 (DLI)(SJB)
              Plaintiff,    :
                            :    May 19, 2021
                            :
          V.                :    Brooklyn, New York
                            :
QUALITY WOODS, INC.,        :
et al.,                     :
              Defendant.    :
----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR INQUEST HEARING
BEFORE THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          AARON SCHWEITZER, ESQ.


For the Defendant:          NO APPEARANCE


Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
1              THE COURT:  I'm Judge Bulsara.  We're here
2   for an inquest hearing in 17-CV-3043.
3              Can counsel state their appearances for the
4   record please?
5              MR. SCHWEITZER:  Good morning, your Honor,
6   again.  This is Aaron Schweitzer appearing for
7   plaintiff Feng Lin, who is also here.
8              THE COURT:  I know we have Mr. Kwak (ph),
9   who is interpreting, is that correct?
10             THE INTERPRETER:  Yes, good morning, your
11  Honor, yes, Mandarin.
12             THE COURT:  Okay, good morning.
13             Mr. Schweitzer, a couple of questions before
14  I begin the hearing and the questioning of Mr. Lin,
15  okay?  Actually, let me do this:  I will ask questions
16  of Mr. Lin after he's placed under oath and then that
17  may make the questions I ask of you either moot or
18  unnecessary rather, so let's proceed that way.
19             Mr. Kwak, you'll begin translation.  The way
20  I'm going to proceed is, there's going to be a question
21  and answer, at least to start me questioning the
22  witness.  I'd ask that you wait until I finish my
23  question, then translate, and the same with Mr. Lin's
24  answers, if that works for you, Mr. Kwak.
25             THE INTERPRETER:  Yes, that works, your
```

1    Honor, thank you.

2           THE COURT:  Mr. Lin, can you see me and hear

3    me?

4           MR. LIN:  Yes, I do.  I can hear you, I can

5    see you, thank you.

6           THE COURT:  My deputy is going to swear you

7    in, so if you could kindly raise your hand.

8           (Defendant is sworn.)

9           THE COURT:  I don't think it's necessary to

10    swear Mr. Kwak (ui).

11    DIRECT EXAMINATION

12    BY THE COURT:

13       Q.  Mr. Lin, good morning.

14       A.  Good morning.

15       Q.  Do you understand that you have brought a

16    lawsuit in federal court through your lawyer?

17       A.  Yes.

18           THE COURT:  Mr. Schweitzer, if you're

19    typing, you need to go on mute.

20    BY THE COURT:

21       Q.  Mr. Lin, you've now been placed under oath and

22    I'm going to ask you some questions about your lawsuit

23    and your employment, okay?

24       A.  Yes.

25       Q.  If you don't understand any of my questions,

1   just let me know.

2     A.  Yes, okay.

3     Q.  Mr. Lin, first, to begin, you have a brought a

4   lawsuit for unpaid wages.  Do you understand that?  I

5   need verbal answers not a nod.

6     A.  Yes.

7     Q.  Mr. Lin, what is the period of time you

8   believe you were not paid the wages you were entitled

9   to?

10    A.  Overtime as well as weekend overtime work.

11     THE COURT:  Mr. Schweitzer, you unmuted

12  yourself and I can hear you typing.  I'm not sure why

13  you did that.

14     MR. SCHWEITZER:  I unmuted myself because

15  the microphone that's picking up Mr. Lin is the

16  microphone that I'm controlling.

17     THE COURT:  Then just stop typing.

18  BY THE COURT:

19    Q.  Mr. Lin, what is the period of time where you

20  believe you were not paid wages?

21    A.  I was not paid overtime work during the work

22  when I work over 40 hours.  I was supposed to schedule

23  to work between 9:00 and 6:00 p.m.  Sometimes -- I'm

24  sorry.  Sometimes my schedule went beyond the regular

25  time and schedule work until 6:00 p.m., 6:30 sometimes,

1    so those overtime were not paid.  Also, on some

2    Sundays, overtime I was not paid.

3         Q.  Mr. Lin, I meant what months in what years are

4    we talking about?

5         A.  The period I'm talking about is March, 2015,

6    which is basically when I first started working there,

7    until around the end of May, May 28th I believe, of

8    2016.

9         Q.  Okay.  And you said when you were working

10   there.  Where are you referring to?

11        A.  So the place I worked at is called Quality

12   Woods, and the address is 1340 Metropolitan Avenue.

13        Q.  Okay.  When you began working -- when did you

14   begin working for Quality Woods?

15        A.  Sometime around March, 2015.

16        Q.  Okay.  And who hired you?

17        A.  My boss, Gao Wei.

18        Q.  Okay.  Did you interview with Mr. Gao Wei?

19        A.  He did try me out for one day, testing one

20   day.

21        Q.  Okay.  And where did he try you out?

22        A.  At the factory, the work location.

23        Q.  Where was the factory work location?

24        A.  1340 Metropolitan Avenue.

25        Q.  Okay.  And what did you understand to be Mr.

```
 1   Gao Wei's relationship to the company you were working

 2   for?

 3        A.   Gao Wei is the boss of this company.

 4        Q.   Was he the owner?

 5        A.   Yes.

 6        Q.   When you started work there, how many people

 7   were working at Quality Woods?

 8        A.   Initially, two, me and another person.

 9        Q.   Was Mr. Gao Wei your boss the entire time you

10   worked there?

11        A.   Yes, yes.

12        Q.   Okay.  Where did you go to work every day?

13        A.   I worked at the 1340 Metropolitan Avenue

14   location every day.  I go there working every day.

15        Q.   Okay.  Did you ever work at any other

16   location?

17        A.   No.

18             THE COURT:  Mr. Schweitzer, I don't know how

19   many times I have to repeat this.  I'm going to end

20   this hearing if you continue typing.

21             MR. SCHWEITZER:  I'm not typing.

22             THE COURT:  Well, then you need to go on

23   mute.

24   BY THE COURT:

25        Q.   Mr. Lin, when you went to work, was there a
```

1    sign of the name of the company at the location?

2        A.   No, because this factory was located -- which

3    he rents -- inside a bigger business or company, inside

4    the location of another company, of another, bigger

5    business.

6        Q.   Okay.  1340 Metropolitan Avenue, what kind of

7    building was it?

8        A.   It's a warehouse-type building.

9        Q.   Okay.  How much space did Quality Woods have

10   in that warehouse?

11       A.   Approximately 5,000 square feet,

12   approximately.

13       Q.   Were there other companies in that building?

14       A.   Yes, yes.

15       Q.   Okay.  Before I ask you about those other

16   companies, if there was no sign on the building, how

17   did you come to learn that the company you were working

18   for was called Quality Woods?

19       A.   Because I've been inside his office and I have

20   also gotten a business card and I looked at it, and I

21   saw Quality Woods.

22       Q.   Whether inside his office or on the business

23   card, were there any other companies listed?

24       A.   No, just his name, the name of the boss there.

25       Q.   Okay.  And the only company listed was Quality

1    Woods?

2        A.  Yes.

3        Q.  Before, you said that Mr. Goa Wei rented

4    space.  Do you remember saying that?

5        A.  Yes.

6        Q.  Okay.  How did you come to learn or understand

7    that?

8        A.  Because a few months Mr. Goa forgot or did not

9    pay his rent and people were talking about it so I

10   heard about it, as well as Mr. Chen, who occupied the

11   space next to him or his neighbor, Mr. Chen, who also

12   makes kitchen cabinets, mentioned that this was rental.

13       Q.  Did you ever work for Mr. Chen?

14       A.  No.

15       Q.  If you know, what were the names of the other

16   -- of Mr. Chen's company?

17       A.  D.C. Kitchen Cabinet.

18       Q.  D.C. Kitchen Cabinet?

19       A.  Yes.

20       Q.  Okay.  Do you know the name of any other

21   companies or were there any other companies in 1340

22   Metropolitan Avenue?

23       A.  Yes, there is another company, a fashion

24   clothing company, but I don't know or forgot the name.

25       Q.  Okay.  Just to confirm, you stopped working

1    for Mr. Gao Wei approximately the end of May, 2016?

2         A.  Yes, correct.

3         Q.  Okay.  During that entire time, did you ever

4    work in Long Island?

5         A.  No.

6         Q.  Have you ever heard of a company called

7    Metropolitan Cabinet Factory, Inc.?

8         A.  I'm not terribly familiar with that name but I

9    would know if I'm given the address.

10        Q.  Okay.  Did you ever work for a company called

11   Metropolitan Cabinet Factory, Inc.?

12        A.  No.

13        Q.  Okay.  Before you referred to D.C. Cabinet

14   Factory.  Did you ever work for them?

15        A.  No.

16        Q.  Have you ever heard of a company called Aotin

17   Trading, A-o-t-i-n Trading?

18        A.  No.

19        Q.  Okay.  To your knowledge, from March of 2015

20   to end of May, 2016, did you work for any company other

21   than Quality Woods, Inc.?

22        A.  No.

23        Q.  Okay.  When you worked at Quality Woods or

24   anytime after that, did you ever hear of someone named

25   Tong, T-o-n-g, first name or last name?

1       A.   Yes, he's my colleague.

2       Q.   Okay.  Was he the other person who worked

3   alongside you?

4       A.   Yes.

5       Q.   Was a boss in any way or a manager or anything

6   like that?

7       A.   No, he is like me, just a worker.

8       Q.   Okay.  Did he continue working after you left

9   the job?

10      A.   Yes.

11      Q.   Okay.  Do you know if he still works there?

12      A.   What I heard -- I only heard about it, that

13   together with other people, he had rented the space

14   that Gao Wei used to rent and tried to do some work

15   there.

16      Q.   Okay.  But have you spoken to Tong directly

17   about this or you just heard through other people?

18      A.   I heard it from Tong.

19      Q.   You heard it from Tong himself?

20      A.   Yes, from him, because we still maintain some

21   contact and have some phone conversations, yes.

22      Q.   Okay.  You mentioned that -- well, let me ask

23   it this way:  Did Mr. Gao Wei ever stop using the 1340

24   Metropolitan Avenue location when you were there?

25      A.   He was still there after I left.

1      Q.   Okay.   Do you know a person with the first or

2  last name Alsie, A-l-s-i-e?

3      A.   No.

4      Q.   Okay.   When you worked at Quality Woods,

5  besides Tong and Gao Wei, was there anyone else who

6  worked for the company as far as you knew?

7      A.   Well, Mr. Tong Wei mostly stayed in the

8  office, rarely at the -- he's rarely at the factory

9  space.   Also, yes, they had other people come in to

10  work but they lasted a few time, maybe a few days, and

11  they were let go or they were gone.

12      Q.   Okay.   You mentioned Mr. Chen.   How do you

13  spell Mr. Chen's name?   It is C-h-e-n or C-h-a-n?

14      A.   C-h-e-n.

15      Q.   C-h-e-n.   Mr. Chen, what was his first name?

16      A.   I just cannot recall at this moment.   I used

17  to know.   I used to remember but this minute, it

18  doesn't come to my mind at this minute.

19      Q.   Okay.   Was it Wei?

20      A.   I'm not sure.

21      Q.   Okay.

22      A.   I can't confirm 100% but it seems like that

23  might be it.

24      Q.   Okay.   Do you know a Ding Chen, D-i-n-g Chen?

25      A.   Yes, yes, actually, I remember now.   It is Mr.

1    Chen Ding.  Mr. Chen is Chen Ding.

2         Q.  Okay.  Did you ever work for Chen Ding?

3         A.  No.

4         Q.  Okay.  And Mr. Chen being a person affiliated

5    with D.C. Cabinet Factory?

6         A.  Yes.

7         Q.  Have you ever heard of a Dean Chen, D-e-a-n?

8         A.  I'm not terribly familiar with that name.

9         Q.  Okay, that's okay.  Do you know a James Wang?

10        A.  Not terribly familiar.

11        Q.  Did you ever work for anyone named James Wang?

12        A.  No.

13        Q.  As far as you know, did James Wang ever have

14   any relationship with Quality Woods, Inc.?

15        A.  Well, at the very beginning, as far as I know,

16   there were two owners of the company, including Mr. Gao

17   Wei.  But early on, they had arguments among themselves

18   so they split early for about a month.  Ever since

19   then, I'm just -- it was just Mr. Gao Wei.

20        Q.  Okay.  Did you ever meet the other person who

21   was a co-owner with Mr. Gao Wei?

22        A.  Yes, maybe only just once or twice face to

23   face.

24        Q.  And that was not -- that co-owner was not Chen

25   Dean, is that what you're saying?

1      A.   It's not.

2      Q.   Okay.   Approximately -- let me ask you this:

3 Did you ever work for Gao Wei in Long Island?

4      A.   No.

5      Q.   Okay.   Did you -- have you ever heard of a

6 company called Champion Cabinet, Inc.?

7      A.   No.

8      Q.   Okay.   Do you know where Mr. Gao Wei lives?

9      A.   Yes.   The address I know that he lives is 158-

10 03 Sanford Avenue, Apartment 3D.

11     Q.   Okay.   Did you ever visit Mr. Gao Wei there?

12     A.   So I've been there at his house or apartment

13 when I went to pick up my pay.

14     Q.   Okay.   Mr. Lin, do you see a document on the

15 screen?

16     A.   Yes.

17     Q.   I just want to know, is this your signature,

18 sir?

19     A.   It is.

20     Q.   Okay.   Let me just show you what this document

21 is, okay?   This is a document that is titled

22 "Declaration of Feng Lin in Support of Plaintiff's

23 Motion for Default Judgment."   Do you see that?

24     A.   I understand.

25     Q.   Okay.   Do you recall signing this document?

1      A.   I remember.

2      Q.   Okay.  Was it provided to you in Mandarin?

3      A.   Yes, in my computer, it was translated.

4      Q.   Okay.  An automatic translation for you?

5      A.   At the time, my attorney using the computer

6  translated it line by line for me on the computer, next

7  to me.

8      Q.   Okay.  Do you see the document says from

9  paragraph 5:  "From on or about March 1, 2015 to May

10 28th, 2016, my regular work schedule ran from 9:00 to

11 18:00 or nine hours per day Monday through Saturday,

12 for a total of 54 hours per week."  Do you see that?

13     A.   Yes, I see it.

14     Q.   Is that accurate?

15     A.   Yes, that is correct.

16     Q.   Okay.  The next paragraph says, "For three to

17 four times between March 1, 2015 to March 28, 2016, I

18 was required to stay after regularly scheduled work

19 hours, and more specifically from 18:30 to 21:00 hours

20 for an extra two and a half hours."  Is that statement

21 true?

22     A.   It is accurate.

23     Q.   Okay.  The next paragraph, it says, "About

24 three to four times during my time of employment, I was

25 required to work on Sundays in addition to my regular

1   schedule.  For those days, I would work from 9:00 to

2   18:00."  Is that statement accurate?

3        A.  Correct.

4        Q.  Okay.  From paragraph 10, it says -- I'm

5   sticking with (ui) paragraphs.  It says, "From on or

6   about March 1, 2015 to May 28, 2016, I was paid a flat

7   compensation at the rate of $3,800 per month in cash.

8   Is that statement accurate?

9        A.  It is correct.

10        Q.  Earlier, you told me you went to Mr. Gao Wei's

11   home to pick up your pay on occasion.  Was that pay in

12   cash or via check?

13        A.  Cash.

14        Q.  If you go to paragraph 18, it says,

15   "Defendants Wei Gao, Wei Zhan Chen, a/k/a Ding Chen,

16   Dean Chen, and James Wang, are co-owners of Quality

17   Woods."  Do you see that?

18        A.  Okay.  Can you please translate for me for one

19   more time?

20        Q.  Sure.  I've just said the first part of this,

21   the first half of paragraph 18.

22             THE COURT:  Mr. Kwak, you can go ahead and

23   translate up to the end of the words "Quality Woods."

24             THE INTERPRETER:  Okay.

25   BY THE COURT:

1      Q.   Do you see that?

2      A.   Yes.

3      Q.   Is that statement true?

4      A.   No, I don't think that's accurate.

5      Q.   Okay.  And what about it is not accurate?

6      A.   Wei Zhan Chen and Dean Chen, neither one of

7   them are the name of the co-owners or owners of Quality

8   Woods.

9      Q.   Okay.  What about James Wang?

10     A.   He says I'm not sure of the name of his ex-

11   partner so therefore, I'm not sure about this.

12     Q.   Okay.  Now, Mr. Lin, if this paragraph is not

13   accurate, why did you sign this declaration?

14     A.   So maybe I made a mistake.  I did mention

15   about D.C. and I did mention that they did rent the

16   facility inside another facility.

17     Q.   Okay.  Let me ask you -- I'm going to take

18   this down, okay.  Did it disappear from your screen?

19     A.   Yes.

20     Q.   I just want to go back to something that I

21   asked before just to confirm that I understand

22   everything that you said.  Have you ever worked for a

23   company called Champion Cabinet?

24     A.   No.

25     Q.   Okay.  Have you ever heard of a company called

1   Champion Cabinet?

2         A.   No.

3         Q.   Okay.  After May 28th, 2016, did you stop

4   working for Mr. Gao Wei?

5         A.   Yes.

6         Q.   At any time since May 28th, 2016, have you

7   worked for Gao Wei?

8         A.   No.

9         Q.   Just give me a moment.  I'm going to show you

10  a photograph, okay?  I just want you to tell me who

11  this person is, okay?

12        A.   Yes.

13        Q.   It's a little bit blurry but do you see that

14  person there?

15        A.   He is Gao Wei.

16        Q.   Okay, that's Mr. Gao Wei?  That's the person

17  you worked for?

18        A.   Yes.

19        Q.   Okay.  And when was the last time you spoke to

20  or saw Mr. Gao Wei?

21        A.   May 28th, 2016, that day.

22        Q.   Did you receive a final payment for your last

23  period of work?

24        A.   No.

25        Q.   Okay.  Did you ever contact Mr. Gao Wei to get

1   any back pay?

2        A.   Yes.

3        Q.   When was that, approximately?

4        A.   May 28th, that was the date, May 28th.

5        Q.   Okay, all right.  Mr. Lin, have you heard of

6   the EEOC?

7        A.   No.

8        Q.   Did you ever file a complaint about the

9   working conditions at Quality Woods, Inc.?

10       A.   No.

11       Q.   Okay.  Mr. Lin, I'm going to show you --

12       A.   Actually, I did complain, I remember now, that

13  Quality Woods did not file tax, so I reported that one

14  time.  I made a complaint that one time.

15       Q.   When did you complain about their failure to

16  pay tax?

17       A.   Approximately a week or two after May 28th.

18       Q.   Okay.  Who did you complain to?

19       A.   I called 311.

20       Q.   Okay.  Did you ever receive any response from

21  311?

22       A.   No, no reply.

23       Q.   Okay.  Mr. Lin, I'm going to show you another

24  document, okay?  Do you see this document on your

25  screen?

1        A.   Yes, I do.

2        Q.   Is that your signature, sir?

3        A.   It is.

4        Q.   Okay.  So this document says -- it's called

5    "EEOC Complainant Affidavit."

6        A.   Okay.

7        Q.   Have you ever seen this document before?

8        A.   Yes.

9        Q.   When did you see this document?

10        A.   This was the initial period.  I only started

11   working maybe a few weeks later.  In my mind, I was

12   going to the Labor or -- yeah, I was going to the Labor

13   Department.  So I think maybe I ended up at EEOC.

14        Q.   Okay.  And what were you going to the Labor

15   Department for, Mr. Lin?

16        A.   So I was not every familiar with any labor

17   regulation or laws.  I wanted to complain about

18   overtime -- I wanted to make complaint about overtime

19   work, the hours, and work injury, that type of

20   complaint.

21        Q.   Okay.  Have you seen this document before

22   today?

23        A.   Yes.

24        Q.   In what context have you seen this document?

25        A.   At my attorney's office.

1     Q.  Do you recall signing an affidavit at your

2 attorney's office and was it this affidavit?

3     A.  Yes.

4     Q.  Was this provided to you in translated form?

5     A.  Yes.

6     Q.  Who was it translated by?

7     A.  The attorney or attorney's assistant.

8     Q.  Is that the same attorney that's representing

9 you in connection with your lawsuit in federal court

10 for wage-and-hour wages?

11     A.  Yes.

12     Q.  Sorry, I should have been clearer, I mis-spoke

13 -- in connection with your federal case for unpaid

14 minimum and overtime wages.

15     A.  Yes, yes.

16     Q.  Okay.  Do you see paragraph 6?  It says, "At

17 the present time and as of April 16th, 2017, the name of

18 my employer changed to Champion Cabinet, Inc. d/b/a

19 Champion Cabinet."  Do you see that?

20     A.  Yes, I see it.

21     Q.  Okay.  Do you have any knowledge about whether

22 this statement is true or not?

23     A.  Can I have that paragraph translated again?

24         THE INTERPRETER:  Your Honor, I'll do that

25 again.

1          THE COURT:  Yes, that's fine.

2          THE INTERPRETER:  Okay.

3          THE WITNESS:  Yes, I'm aware of this matter,

4   yes.

5   BY THE COURT:

6      Q.   Before, you told me you had not heard of

7   Champion Cabinet.  Do you recall that?

8      A.   Well, I noticed the address, 40 East Merrick

9   Road, and that reminded me of it, of the name.  Also,

10  because I'm not -- I already left so I wasn't terribly

11  familiar with the name to begin with.

12     Q.   Okay.  So I'm asking you again, and please

13  listen to my question and answer my question, okay, Mr.

14  Lin?

15     A.   Okay.

16     Q.   Paragraph 6 says, at the present time, the

17  name of my employer changed to Champion Cabinet, okay?

18     A.   I see it.

19     Q.   Okay.  At some point, did you learn that

20  Quality Woods had changed its name?

21     A.   Yes.

22     Q.   How did you learn that?

23     A.   Mr. Tong informed me or told me.

24     Q.   When did he do that?

25     A.   After a while long while when I started

1  working for him, and shortly before he was about to

2  move into the new location or new space.

3      Q.  Okay.  And where was that new location or

4  space?

5      A.  The new address is 40 East Merrick Road,

6  Freeport, New York, 11510.

7      Q.  Before looking at this affidavit today, did

8  you know that?

9      A.  I did know the address.

10     Q.  How did you know the address?

11     A.  Because Mr. Cheng was sent over to that

12 location to work a couple of times, and I did ask Mr.

13 Tong to do me a favor and send me the GPS location of

14 that location.

15     Q.  Okay.  Approximately when was this?

16     A.  Sometime between July and September of 2015.

17 It's a long time ago so approximately between July and

18 September.

19     Q.  Just to confirm again, did you ever work for

20 Champion Cabinet?

21     A.  No.

22     Q.  Okay.  Have you ever been to 40 East Merrick

23 Road?

24     A.  I have passed by.  I have passed by it in my

25 vehicle.

1      Q.  Okay.  Do you recall, are there any signs on

2  that building?

3      A.  No, or at least I did not notice any, but I

4  did notice an ex-coworker, Mr. Lee, Mr. Gao Lee, was

5  coming in and out of that location.

6      Q.  Okay.  When did you go to 40 East Merrick Road

7  and observe Mr. Lee going in and out?

8      A.  Also between July and September, 2016, also

9  around that period.

10     Q.  Okay.  I'm going to show you that affidavit

11  again.  Do you see it on your screen?

12     A.  Yes.

13     Q.  Okay.  Paragraph 44 says, "D.C. Cabinet

14  Factory, Inc., a tile company and a window company,

15  rents space in the warehouse at 1340 Metropolitan

16  Avenue, Brooklyn, New York, 11237, where all three

17  companies and Quality Woods do business from the

18  landlord.  D.C. Cabinet Factory, Inc. sublets space in

19  the warehouse to Quality Woods."  Do you see that?

20     A.  I see it.

21     Q.  Okay.  Is that statement accurate?

22     A.  Accurate.

23     Q.  Okay.  Is it your understanding that D.C.

24  Cabinet Factory, Inc. was the company that gave space

25  to Quality Woods?

1          A.  Yes.

2          Q.  Other than giving it space, was there any

3   other relationship between D.C. Cabinet Factory, Inc.

4   and Quality Woods?

5          A.  No.

6          Q.  If you could go to paragraph 50, it says, "On

7   or about late August or early September, 2016, D.C.

8   Cabinet Factory received a letter from the Department

9   of Business saying there had been a report made against

10  them.  The report was referring to my report against

11  Quality Woods, which had mistakenly referred to D.C.

12  Cabinet Factory.  I know that D.C. Cabinet Factory

13  received the letter because Mr. Chen called me to tell

14  me I had reported the wrong company.  It was in fact

15  the Department of Business which mailed to the wrong

16  company and had Mr. Gao about the letter."  Do you see

17  that?

18          A.  Yes, I see.

19          Q.  Is this statement accurate?

20          A.  It's accurate.

21          Q.  Did this incident happen as you described it?

22          A.  Yes.

23          Q.  And the Mr. Chen that's referred to in this

24  paragraph, that is Mr. Ding Chen?

25          A.  Yes.

1      Q.   To the best of your knowledge, Mr. Ding Chen

2   had no relationship to Quality Woods?

3      A.   Correct.

4      Q.   And you never worked for Mr. Chan according to

5   this paragraph, is that correct?

6      A.   Correct.

7      Q.   Okay.  Have you heard of an address of 38

8   Merrick Road?

9      A.   38 Merrick Road, isn't that close to his

10   place?  But I'm not paying much attention to that

11   address.

12      Q.   The affidavit we were just talking about

13   talked about 40 East Merrick Road.  Do you recall that?

14      A.   I remember.

15      Q.   And you said to me that Champion Cabinet, Inc.

16   is located at 40 East Merrick Road.  Do you recall

17   that?

18      A.   Yes, I remember.

19      Q.   Do you have any knowledge of Champion Cabinet,

20   Inc. ever being affiliated with 38 East Merrick Road as

21   well?

22      A.   I don't really know.

23      Q.   It's a yes-or-no question.  Have you in fact

24   ever heard of Champion Cabinet, Inc. being affiliated

25   with 38 Easter Merrick Road, yes or no?

```
 1        A.   No.

 2        Q.   As far as you know, is Champion Cabinet, Inc.

 3   still active at 40 East Merrick Road?

 4        A.   I've not been there for a long time so I

 5   cannot be sure as of now.

 6        Q.   When was the last time you spoke to Mr. Tong?

 7        A.   Anywhere between July and September of 2015.

 8        Q.   Okay.  What is -- you had answered this

 9   before.  What is Mr. Tong's first or last name?

10        A.   No, I don't really know.  I only call him by

11   his nickname, Old Man.

12        Q.   Okay.  And that's because he's an older

13   gentleman?

14        A.   Yes.

15        Q.   Okay, all right.

16             THE COURT:  Mr. Schweitzer, Mr. Schweitzer?

17             MR. SCHWEITZER:  (Ui), your Honor.

18             THE COURT:  I'm addressing you.  I haven't

19   even asked you a question.

20             MR. SCHWEITZER:  Yes, your Honor.

21             THE COURT:  So that concludes my questioning

22   of Mr. Lin.  Are there any other areas you'd like to

23   inquire about?

24             MR. SCHWEITZER:  No, your Honor.  I would

25   like to note for the record that D.C. Cabinet Factory,
```

1   Inc., Aotin Trading, Inc., Metropolitan Cabinet

2   Factory, Inc., Wei Zhan Chen, Ding Chen, and James Wang

3   were voluntarily dismissed pre-answer at docket number

4   57 on September 11, 2020, which was so ordered by --

5            THE COURT:  I'm well aware of that.  But you

6   have no questions for Mr. Lin?

7            MR. SCHWEITZER:  No, your Honor.

8            THE COURT:  The question I have for you is,

9   against whom are you seeking a default judgment in this

10  case?

11           MR. SCHWEITZER:  Wei Gao, Quality Woods,

12  Inc., and Champion Cabinet, Inc.

13           THE COURT:  Okay.  I will set a deadline for

14  you to submit -- you can order the transcript of the

15  proceeding -- briefing on a default judgment motion.

16           MR. SCHWEITZER:  I believe we did that.

17           THE COURT:  Mr. Schweitzer, you did do that

18  but you're going to have to supplement it with -- we

19  just had an inquest here where your client was asked

20  specific dates of employment and who he worked for and

21  when, so that's number one.  If you choose to rest on

22  your prior papers, then you know, I'm not going to give

23  you the benefit of the evidence that was adduced here

24  that might support your motion.

25           MR. SCHWEITZER:  Understood.

1            THE COURT:  The second thing is, I'm going

2    to separately issue orders to show cause and I'll

3    detail this so you don't need to write it down.  It

4    will be in an order, asking you to explain why this

5    lawsuit continued for multiple years against entities

6    that your client never worked for and you sought

7    defaults against them and filed default judgment

8    motions against them and continued to serve them with

9    process, even though it was quite evident from basic

10   questioning of your client that he never worked for

11   those entities.

12            You can either do that in the context of

13   your default judgment motion or you can do that

14   separately.  It's entirely up to you, and I can set

15   separate deadlines.  How much time would you like for

16   both?  As I said, I'll issue an order to show cause

17   which details the issues to address in that, but how

18   much time on the default judgment motion?

19            MR. SCHWEITZER:  Can I have it by June 18th,

20   your Honor?  I'd ask for three weeks but the third

21   week, I have an evidentiary hearing on a matter.

22            THE COURT:  That's fine.  If it takes some

23   additional time after you get the transcript, you can

24   just make a request and I'll be happy to grant that.

25   But for now, we'll set it at June 18th.  Then for the

1  response to the order to show cause, do you need more

2  time than that?

3          MR. SCHWEITZER:  It can be at the same time.

4          THE COURT:  All right, great.  Is there

5  anything else at this point from your perspective?

6          MR. SCHWEITZER:  No, your Honor.

7          THE COURT:  Okay, all right.  Thank you, Mr.

8  Kwak.

9          Thank you, Mr. Lin.

10         Thank you, Mr. Schweitzer.  I wish all of

11  you a good day.

12                      *  *  *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                    May 26, 2021
```